## IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

## BEFORE:  THE HONORABLE TIMOTHY C. STANCEU, SENIOR JUDGE

| | |
|---|---|
| ADEE HONEY FARMS, *et al.*, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | )   Consol. Ct. No. 16-00127 |
| | ) |
| UNITED STATES, *et al.*, | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM IN SUPPORT OF PLAINTIFFS'
## RULE 56.1 MOTION FOR JUDGMENT ON THE AGENCY RECORD

Paul C. Rosenthal
Michael J. Coursey
John M. Herrmann II
Jennifer E. McCadney
Cameron R. Argetsinger
KELLEY DRYE & WARREN, LLP
3050 K Street, N.W., Suite 400
Washington, D.C.  20007
(202) 342-8400

*Counsel to Plaintiffs with the exception of
Monterey Mushrooms, Inc.*

Louis S. Mastriani
ADDUCI, MASTRIANI & SCHAUMBERG,
L.L.P.
1133 Connecticut Ave., N.W.
Washington, DC 20036
(202) 467-6300

*Co-Counsel to Plaintiffs in* <u>A&S Crawfish v.
United States</u>*, CIT Ct. No. 16-00131*

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................... 1

RULE 56.1 STATEMENT ..................................................................................... 6

    A.    Administrative Determination Under Review ........................................... 6

    B.    Issues Presented ....................................................................................... 7

FACTUAL AND PROCEDURAL HISTORY ....................................................... 7

    A.    The CDSOA Requires Customs to Distribute "All Interest" "Earned" on "All Funds" from Assessed AD/CV Duties Received .......... 7

    B.    At the Outset of Its Rulemaking Process, Customs Planned to Include § 1505(d) Interest in CDSOA Distributions, But Later Decided Against This ................................................................................. 8

    C.    In Late July 2014, Customs Informed Plaintiffs It Would Withhold from CDSOA Distribution $5.5 million of the $6.1 million *Great American* Award it Applied to Recover Accrued § 1505(d) Interest ...... 10

    D.    Congress Enacted Section 605, Reiterating that "All Interest" in the CDSOA Means "All Interest" .......................................................... 11

    E.    Plaintiffs Filed Suit to Recover All § 1505(d) Interest That Customs Withheld from the FY 2001 through FY 2014 CDSOA Distributions ........................................................................................... 12

    F.    Customs' Administrative Record Discloses No Basis for the Agency's Decision to Withhold Delinquency Interest Other Than Its "Technological Limitations" ............................................................... 13

ARGUMENT ....................................................................................................... 15

    I.    Standard of Review .................................................................................. 16

    II.    *Chevron* Step One: The CDSOA Unambiguously Requires Customs to Distribute "All Interest," Including Delinquency Interest, to Plaintiffs ............. 18

        A.    To Determine Congress' Intent as to § 1505(d) Interest, the Court Must Give the Relevant CDSOA Text Its Plain Meaning and Look to the CDSOA's Purpose ........................................................... 18

        B.    By Its Plain Meaning, the CDSOA Unambiguously Requires the Distribution of Delinquency Interest ...................................................... 19

i

          1.      The Text of the Distribution Provision Is Unambiguous ............. 19

          2.      The Government's Interpretation of "All Interest" Defies
                Reason .......................................................................................... 23

    C.      The Context and Placement of the Statutory Language Supports
         the Distribution of § 1505(d) Interest ....................................... 25

          1.      Congress' Findings in Enacting the CDSOA Support
                Interpreting "All Interest" as Including § 1505(d) Interest ......... 26

          2.      Both Types of Interest Have the Same Purpose of
                Compensating the Government for Its Loss of Timely Use
                of Funds Owed It ....................................................................... 27

    D.      The Legislative History Does Not Support Any Other Conclusion ........ 29

III.    *Chevron* Step Two: If the Court Finds Congress' "All Interest" Is
      Ambiguous, No Deference Is Owed Customs' Decision to Withhold
      § 1505(d) Interest ................................................................................... 30

    A.      Customs' Withholding of § 1505(d) Interest Obviously Frustrated
         Congress' Purpose in Enacting the CDSOA ............................................ 31

    B.      As Customs' Decision to Withhold § 1505(d) Interest is Patently
         Unreasonable, It Is Owed No *Chevron* Deference ................................. 31

    C.      Congress in the CDSOA Did Not Delegate Authority to Customs
         to Decide What Types of Interest to Distribute ...................................... 32

          1.      Congress Only Authorized Customs to Promulgate
                Regulations Concerning the "Time and Manner" of
                CDSOA Distributions ................................................................. 32

          2.      Congress Only Authorized Customs to Act "By
                Regulation," Which Does Not Include Decisions
                Articulated Only in a Preamble .................................................. 34

          3.      Congress Delegated No Other Authority to Customs to
                Make Substantive Interpretations of the CDSOA ....................... 35

    D.      As Customs Failed in 2001 to Provide Any Reason for Its Decision
         to Withhold § 1505(d) Interest, that Decision Is Arbitrary and
         Capricious ............................................................................................... 36

IV.    Because Customs' Interpretation Is Not Entitled to Deference, the Court
      Must Find, on *De Novo* Review, That Congress Intended Customs to
      Distribute Delinquency Interest ........................................................................... 39

CONCLUSION....................................................................................................................... 40

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Adee Honey Farms v. United States,*
  450 F. Supp. 3d 1365 (Ct. Int'l Trade 2020) .......................................................4, 6, 10, 34, 38

*Adee Honey Farms v. United States,*
  Slip Op. 20-184, 2020 Ct. Intl. Trade LEXIS 196
  (Dec. 21, 2020) (ECF No. 102)........................................................................................5, 14

*Aqua Prods.. Inc. v. Matal,*
  872 F.3d 1290 (Fed. Cir. 2017).................................................................................. *passim*

*Candle Corp. of Am. v. United States,*
  374 F.3d 1087 (Fed. Cir. 2004)...............................................................................................18

*Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.,*
  467 U.S. 837 (1984)................................................................................................. *passim*

*Chudik v. Hirshfeld,*
  987 F.3d 1033 (Fed. Cir. 2021).....................................................................................6, 40, 41

*Citizens to Preserve Overton Park, Inc. v. Volpe,*
  401 U.S. 402 (1971)..............................................................................................................14, 16

*Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.,*
  447 U.S. 102 (1980).....................................................................................................................18

*Encino Motorcars, LLC v. Navarro,*
  136 S. Ct. 2117 (2016)............................................................................................... *passim*

*Facebook v. Windy City Innovations, LLC,*
  973 F.3d 1321 (Fed. Cir. 2020).........................................................................................37, 39

*Gardner v. State of N.J.,*
  329 U.S. 565 (1947)....................................................................................................................22

*Gonzales v. Oregon,*
  546 U.S. 243 (2006)................................................................................................... *passim*

*Hawkins v. United States,*
  469 F.3d 993 (Fed. Cir. 2006).................................................................................................18

*Huaiyin Foreign Trade Corp. (30) v. United States*
  322 F.3d 1369 (Fed. Cir. 2003) ...............................................26

*Intra-Cellular Therapies, Inc. v. Iancu,*
  938 F.3d 1371 (Fed. Cir. 2019)................................................25

*Jones v. R.R. Donnelley & Sons Co.*
  541 U.S. 369 (2004) ................................................................31

*Judulang v. Holder,*
  565 U.S. 42 (2011)..................................................................36

*Life Techs. Corp. v. Promega Corp.,*
  137 S. Ct. 734 (2017)..............................................................21

*MCI Telecomms. Corp. v. AT&T Co.,*
  512 U.S. 218 (1994)................................................................31

*Mellouli v. Lynch,*
  575 U.S. 789 (2015)................................................................31

*Miller v. Office of Personnel Mgmt.,*
  903 F.3d 1274 (Fed. Cir. 2018)........................................17, 30

*N.H. Hosp. Ass'n v. Azar,*
  887 F.3d 62 (1st Cir. 2018) .....................................................34

*N.Y. & Presbyterian Hosp. v. United States,*
  881 F.3d 877 (Fed. Cir. 2018)................................................20

*National Fisheries Institute, Inc. v. United States,*
  637 F. Supp. 2d 1270 (Ct. Int'l Trade 2009) (Stanceu, J.)..............35, 40

*Norfolk & W. Ry. Co. v. Am. Train Dispatchers Ass'n,*
  499 U.S. 117 (1991)................................................................22

*Nucor Corp. v. United States,*
  927 F.3d 1243 (Fed. Cir. 2019)........................................31, 32

*Peter v. Nantkwest, Inc.,*
  140 S. Ct. 365 (2019)..............................................................21

*Pub. Citizen v. Heckler,*
  653 F. Supp. 1229 (D.D.C. 1986) ...........................................38

*Salman Ranch Ltd. v. United States,*
  573 F.3d 1362 (Fed. Cir. 2009)......................................... 16-17

*SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*,
    242 F.3d 1337 (Fed. Cir. 2001).................................................................22

*Sharp v. United States*,
    580 F.3d 1234 (Fed. Cir. 2009)........................................................... 18-19

*Skidmore v. Swift & Co.*,
    323 U.S. 134 (1944)..................................................................................39

*Sunoco, Inc. v. United States*,
    908 F.3d 710 (Fed. Cir. 2018)..................................................................29

*Supernus Pharms., Inc. v. Iancu*,
    913 F.3d 1351 (Fed. Cir. 2019)................................................................18

*TiVo, Inc., v. EchoStar Corp.*,
    646 F.3d 869 (Fed. Cir. 2011)..................................................................22

*U.S. Capitol Police v. Office of Compliance*,
    908 F.3d 748 (Fed. Cir. 2018)..................................................................21

*United States v. Am. Home Assur. Co.*,
    113 F. Supp. 3d 1297 (Ct. Int'l Trade 2015) (Eaton, J.), *aff'd*,
    Appeal No. 18-1487 (Fed. Cir. Sept. 6, 2019) (per curiam) ....................21

*United States v. Am. Home Assur. Co.*,
    CIT Consol. Ct. No. 09-00401, 151 F. Supp. 3d 1328 (Ct. Int'l Trade 2016)
    (Eaton, J.), *aff'd*, Appeal Nos. 2018-1960, -2120 (Fed. Cir. Sept. 6, 2020)
    (per curiam)...............................................................................................21

*United States v. Am. Home Assur. Co.*,
    789 F.3d 1313 (Fed. Cir. 2015)................................................................22

*United States v. Golden Gate Petroleum Co.*,
    469 F. Supp. 2d 1338 (Ct. Int'l Trade 2007) ..........................................28

*United States v. Great Am. Ins. Co.*,
    791 F. Supp. 2d 1337 (Ct. Int'l Trade 2011), *aff'd in part, rev'd in part*,
    738 F.3d 1320 (Fed. Cir. 2013), *revised judgment on remand*,
    CIT Ct. No. 09-00187 (ECF No. 135) (Mar. 13, 2014).......................3, 10

*United States v. Mead Corp.*,
    533 U.S. 218 (2001)......................................................................17, 32, 39

*Utility Air Regulatory Grp. v. EPA*,
    573 U.S. 302 (2014).................................................................................6

*Williams v. United States*,
    289 U.S. 553 (1933).................................................................................................. 21-22


## Statutes and Regulations

5 U.S.C. § 706 ..............................................................................................................................1

5 U.S.C. §§ 706 (A), (C) ...........................................................................................................16

19 U.S.C. § 1675c, *repealed by* Deficit Reduction Act of 2005,
    Pub. L. 109-171, § 7601(a), 120 Stat. 4, 154 (2006) Repealed, subject to
    savings provision by Deficit Reduction Act of 2005, Pub. L. No. 109-171, §
    7601, 120 Stat. 4, 154-155 (Feb. 8, 2006).  Amended by *Claims Resolution
    Act of 2010*, Pub. L. Nos. 109-171 § 7601(b), 111-291 § 822 (2010), and 111-
    312 § 504 (2010).  Amended by Section 605 of the Trade Facilitation and
    Trade Enforcement Act of 2015, Pub. L. 114-125 (Feb. 24, 2016)............................... *passim*

19 U.S.C. § 580 ...............................................................................................................11, 21, 22

19 U.S.C. § 1500 .......................................................................................................................27

19 U.S.C. § 1505(d) ........................................................................................................... *passim*

19 U.S.C. § 1671 et seq. ...............................................................................................................1

19 U.S.C. § 1673 et seq. ...............................................................................................................1

19 U.S.C. § 1673f(b)(1) ............................................................................................................28

19 U.S.C. § 1675c(a) ...................................................................................................7, 19, 20

19 U.S.C. § 1675c(b)(1) ..............................................................................................................2

19 U.S.C. § 1675c(c) ...........................................................................................................4, 8, 33

19 U.S.C. § 1675c(d)(3) ..................................................................................................... *passim*

19 U.S.C. § 1675c(e)(2) ........................................................................................................23, 24

19 U.S.C. § 1675c(e)(3) ....................................................................................................4, 8, 33, 34

19 U.S.C. § 1677g ............................................................................................................... *passim*

28 U.S.C. § 1581(i) ...................................................................................................................16

28 U.S.C. § 2640(e) ...................................................................................................................16

19 C.F.R. § 24.3a ............................................................................................................11, 28


**Legislative**

CONGRESSIONAL FINDINGS OF FACT, Oct. 28, 2000, P.L. 106-387, § 1(a),
    114 Stat. 1549 (enacting into law § 1002 of Title X of H.R. 5426 (114 Stat.
    1549A-72), as introduced on Oct. 6, 2000) ......................................................1, 26

Congressional Record, Vol. 145, No. 8 at S497 (Jan. 19, 1999) .................................30

Congressional Record at S10697 (Oct. 18, 2000) ......................................................30

Congressional Record, Feb. 11, 2016, at S843 .................................................... 11-12


**Administrative Determinations**

*Antidumping Duty Order: Fresh Garlic From the People's Republic of China*,
    59 Fed. Reg. 59,209 (Dep't Commerce Nov. 16, 1994) ("Garlic Order") ..................... *passim*

*Notice of Amendment of Final Determination of Sales at Less Than Fair Value
    and Antidumping Duty Order: Certain Preserved Mushrooms From the
    People's Republic of China*, 64 Fed. Reg. 8308
    (Dep't Commerce Feb. 19, 1999) ("Mushrooms Order")................................. *passim*

*Notice of Amendment to Final Determination of Sales at Less Than Fair Value
    and Antidumping Duty Order: Freshwater Crawfish Tail Meat From the
    People's Republic of China*, 62 Fed. Reg. 48,218
    (Dep't Commerce Sept. 15, 1997) ("Crawfish Order")................................. *passim*

*Notice of Amended Final Determination of Sales at Less Than Fair Value and
    Antidumping Duty Order; Honey From the People's Republic of China*,
    66 Fed. Reg. 63,670 (Dep't Commerce Dec. 10, 2001) ("Honey Order") ..................... *passim*


**Miscellaneous**

*American Heritage College Dictionary* 551 (3rd Ed. 2000).........................................20

*Distribution of Continued Dumping and Subsidy Offset to Affected Domestic
    Producers (Proposed Rule)*, 66 Fed. Reg. 33,920 (June 26, 2001) ("NPRM") .............. *passim*

*Distribution of Continued Dumping and Subsidy Offset to Affected Domestic
Producers (Final Rule),* 66 Fed. Reg. 48,546 (Sept. 21, 2001)
("NFRM") ........................................................................................ *passim*

Reorganization Plan No. 3 of 1979, 44 Fed. Reg. 68,273 (1979) (effective as of
January 2, 1980 under Exec. Order No. 12,188 of January 2, 1980, 45 Fed.
Reg. 989 (1980)) (Reorganization Plan) ................................................. 36

World Trade Organization, Report of the Appellate Body,
*United States — Continued Dumping and Subsidy Offset Act of 2000,*
WT/DS234/AB/R (Jan. 16, 2003) ........................................................ 2

# INTRODUCTION[1]

One hundred years ago Congress enacted the Antidumping Act of 1921, which subsequently was moved to the Tariff Act of 1930.[2]  That law, like the countervailing duty statute that was enacted a few decades earlier, provided that collected antidumping (AD) and countervailing (CV) duties (AD/CV Duties) – including all types of collected interest that had accrued on the duties – be deposited in the General Fund of the U.S. Treasury.  For 80 years following the 1921 Act, those duties and interest were kept by the U.S. Government.  In enacting the Continued Dumping and Subsidy Offset Act of 2000 (CDSOA),[3] Congress addressed a persistent problem: Domestic industries that sought relief from injuries caused by dumped and

---

[1] Plaintiffs here are all named plaintiffs other than Monterey Mushrooms, Inc., which is represented by separate counsel.  Plaintiffs are members of the domestic fresh garlic, crawfish tail meat, certain preserved mushrooms, and honey industries, and are Petitioners under the AD orders on competing imports of those products from China (Four Orders).

*See Antidumping Duty Order: Fresh Garlic From the People's Republic of China*, 59 Fed. Reg. 59,209 (Dep't Commerce Nov. 16, 1994) (Garlic Order); *Notice of Amendment to Final Determination of Sales at Less Than Fair Value and Antidumping Duty Order: Freshwater Crawfish Tail Meat From the People's Republic of China*, 62 Fed. Reg. 48,218 (Dep't Commerce Sept. 15, 1997) (Crawfish Order); *Notice of Amendment of Final Determination of Sales at Less Than Fair Value and Antidumping Duty Order: Certain Preserved Mushrooms From the People's Republic of China*, 64 Fed. Reg. 8308 (Dep't Commerce Feb. 19, 1999) (Mushroom Order); *Notice of Amended Final Determination of Sales at Less Than Fair Value and Antidumping Duty Order; Honey From the People's Republic of China*, 66 Fed. Reg. 63,670 (Dep't Commerce Dec. 10, 2001) (Honey Order).

[2] *See* Tariff Act of 1930, Ch. 497, Title VII, §§ 731, *et seq.* (1930) (as amended 19 U.S.C. §§ 1673 *et seq.*); Antidumping Act of 1921, Ch. 14, tit. II, 42 Stat. 11 (1921) (previously codified as amended at 19 U.S.C. § 160 *et seq.* (1976)), repealed by Pub. L. No. 96-39, tit. I, § 106(a), 93 Stat. 193 (1979).

[2] *See* Public Law 106-387, 114 Stat. 1549 (Oct. 28, 2000), Title X, which added the CDSOA as a new section (§ 754) to Title VII of the Tariff Act of 1930 (19 U.S.C. § 1671 *et seq.*), codified at 19 U.S.C. § 1675c.  Repealed, subject to savings provision by Deficit Reduction Act of 2005, Pub. L. No. 109-171, § 7601, 120 Stat. 4, 154-155 (Feb. 8, 2006).  Amended by *Claims Resolution Act of 2010*, Pub. L. Nos. 109-171 § 7601(b), 111-291 § 822 (2010), and 111-312 § 504 (2010).  Amended by Section 605 of the Trade Facilitation and Trade Enforcement Act of 2015, Pub. L. 114-125 (Feb. 24, 2016).

subsidized imports often continued to be injured despite the imposition of remedial duties.  To address this failure, Congress effected a dramatic change: Instead of the government retaining collected AD/CV duties and interest, the CDSOA required U.S. Customs and Border Protection (Customs) to henceforth distribute all collected AD/CV duties and interest to the injured domestic companies, called "affected domestic producers" (ADPs).[4]  While the redirection of the funds to the ADPs was controversial – and a World Trade Organization ruling described it as a "double remedy"[5] – there was no doubt that Congress wanted domestic producers – not the U.S. Treasury – to receive all collected AD/CV duties and interest that accrued on such duties.  As ADPs were to stand in the shoes of the government as the beneficiaries of the funds, Congress' mandate for *all* interest to be distributed to injured domestic industries was integral to the congressional purpose.

Customs, however, ignored the statutory language and Congress' will, and decided not to distribute collected delinquency interest that had accrued on unpaid AD/CV duties under 19 U.S.C. § 1505(d) (§ 1505(d) interest).  Delinquency interest, of course, is intended to compensate a creditor for its inability to use a late-paid debt over its period of delinquency.  It thus is inconceivable that Congress intended Customs to withhold collected § 1505(d) interest from distribution to ADPs under the CDSOA, particularly given the perverse results of that agency's decision to do so.  These included Customs' first applying any received payment on delinquent AD/CV duties to recover all delinquency interest that had accrued on the duties – which Customs

---

[4] The CDSOA defines "affected domestic producer" as a U.S. "manufacturer, producer, farmer, rancher, or worker representative" that was a "petitioner or interested party in support of a petition with respect to which an antidumping duty . . . or a countervailing duty order was entered."  19 U.S.C. § 1675c(b)(1).

[5]  World Trade Organization, Report of the Appellate Body, *United States — Continued Dumping and Subsidy Offset Act of 2000*, WT/DS234/AB/R ¶ 43 (Jan. 16, 2003).

withheld from CDSOA distribution – and then applying only any remaining amount of the payment to recover that amount of unpaid AD/CV duties, which Customs distributed.

These results were first publicly demonstrated by Customs' application of $5.5 million of this Court's $6.1 million *Great American* award[6] to pay down all of the delinquency interest that had accrued on the unpaid $6.1 million in AD duties secured by six single-entry customs bonds with the same total face value – which Customs withheld from distribution – leaving only $400,000 in collected AD duties to be distributed.  While Customs ultimately settled Plaintiffs' challenge to its withholding of $5.5 million of the *Great American* award (which was Count 1 of the original complaint filed by Plaintiffs under the Crawfish Order),[7] Plaintiffs here seek the remainder of the delinquency interest Customs collected but unlawfully withheld from CDSOA distribution under the Four Orders through FY 2014.[8]

As explained more fully below, collected § 1505(d) interest that accrued on billed but unpaid AD/CV duties is clearly subject to distribution under the CDSOA, as Congress therein instructed Customs to "distribute" to ADPs "all funds (including *all interest* earned on the funds) from assessed" AD/CV "duties received" on entries subject to that law.  19 U.S.C. § 1675c(d)(3) (emphasis added).  Congress' use of "*all* interest" shows (1) it was then aware that there was *more than one type* of interest – including § 1505(d) – that accrues on assessed but unpaid

---

[6]  *United States v. Great Am. Ins. Co.*, 791 F. Supp. 2d 1337 (Ct. Int'l Trade 2011), *aff'd in part, rev'd in part*, 738 F.3d 1320 (Fed. Cir. 2013), *revised judgment on remand*, CIT Ct. No. 09-00187 (ECF No. 135) (Mar. 13, 2014).

[7]  *A&S Crawfish v. United States*, CIT Ct. No. 16-00131 (currently consolidated with the present action), Compl. ¶¶ 25-28 (ECF No. 2) (Jul. 15, 2016).

[8]  Customs withheld all collected § 1505(d) interest from FY 2001 through FY 2014, when Congress first learned of Customs' practice, and amended the CDSOA by requiring the agency to distribute such interest collected by application of payments made under customs bonds received on or after October 1, 2014 (the first day of FY 2015).  *See* Section 605 of the Trade Facilitation and Trade Enforcement Act of 2015, Pub. L. 114-125 (Feb. 24, 2016) (Section 605).

AD/CV duties; and (2) it intended *all* such interest types to be subject to CDSOA distribution. As the supplemented administrative record shows, Customs nevertheless chose for its own administrative convenience not to distribute collected delinquency interest, and thereby knowingly ignored the clearly expressed direction of Congress.

Where, as here, Congress has spoken clearly and directly, a court reviewing an agency's contrary action must enforce the statute as written, with no regard for the agency's reasons for its actions. *Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc*., 467 U.S. 837, 842-44 (1984). Deference to an agency's statutory interpretation is only available when the statute is ambiguous, which the CDSOA is not. *Id.*

Where Congress' intent in statutory language is ambiguous, the Court may grant deference to an agency's reasonable interpretation of the language when it is made under specific authority delegated by Congress. *Gonzales v. Oregon*, 546 U.S. 243, 258 (2006). But Congress in the CDSOA only authorized Customs to adopt "time and manner" regulations for CDSOA distributions, which does not include the ability to interpret that law's substantive terms like "all interest." 19 U.S.C. §§ 1675c(c), (e)(3). Because Customs overstepped the CDSOA's limited grant of authority, no *Chevron* deference is due. *Gonzales*, 546 U.S. at 259.

Further, while the Court has found that Customs gave notice of its *decision* to distribute only § 1677g interest in the preamble of its notice of final rulemaking under the CDSOA (NFRM),[9] *see Adee Honey Farms v. United States*, 450 F. Supp. 3d 1365, 1372 (Ct. Int'l Trade 2020) (*Adee Honey*), Customs nonetheless failed to present its contemporaneous *reason* for that decision in its NFRM or elsewhere in the administrative record. Thus, even if Customs did not

---

[9] *See Distribution of Continued Dumping and Subsidy Offset to Affected Domestic Producers*, 66 Fed. Reg. 48,546 (Sept. 21, 2001) (NFRM).

exceed the limited rulemaking authority delegated by Congress when it made its decision, Customs' lack of explanation for that decision renders it arbitrary and capricious – *i.e.*, unreasonable – and thus ineligible for *Chevron* deference.  *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125 (2016) ("One of the basic procedural requirements of administrative rulemaking is that an agency must give adequate reasons for its decisions. . . . But where the agency has failed to provide even that minimal level of analysis, its action is arbitrary and capricious and so cannot carry the force of law.") (citations omitted).

In fact, the record shows that Customs' staff initially assumed that both § 1505(d) and § 1677g interest would be distributed under the CDSOA, and worked to enable its accounting system to accomplish this.  *See* Administrative Record Supplement, ECF No. 105 (Feb. 19, 2021) (public) (AR Supp.) at 511.[10]   Later, however, Customs decided it would withhold § 1505(d) interest.  AR Supp. 579.  The only contemporaneous reference to this decision is in a Customs document dated after the agency issued its June 27, 2001 notice of proposed rulemaking (NPRM).[11]   *Id.*  But neither that document nor any other contemporaneous record document discloses the *reason* for Customs' decision.

Indeed, a September 21, 2016 letter from the Commissioner of Customs to two United States Senators,[12] and the February 19, 2021 declaration of a Customs official that was filed with the AR Supp.,[13] show that Customs' sole reason for deciding in 2001 to withhold § 1505(d)

---

[10] All citations are to the public supplemental record.  *See also*, confidential version at ECF No. 106 (Mar. 2, 2021) (confidential)

[11] *See Distribution of Continued Dumping and Subsidy Offset to Affected Domestic Producers*, 66 Fed. Reg. 33,920 (June 26, 2001) ("NPRM").

[12] *See Adee Honey Farms v. United States*, Slip Op. 20-184 at 7, 2020 Ct. Intl. Trade LEXIS 196, at *8 (ECF No. 102) (Dec. 21, 2020).

[13] *See* AR Supp. 006.

interest from CDSOA distributions was its accounting system's inability to do so.  AR Supp. 006.  Administrative convenience, however, cannot justify Customs' disregard of a congressional directive, as "an agency may not rewrite clear statutory terms to suit its own sense of how the statute should operate."  *Utility Air Regulatory Grp. v. EPA*, 573 U.S. 302, 328 (2014).  Thus, Customs' decision is arbitrary and capricious – *i.e.*, unreasonable -- on its face, and therefore is not entitled to *Chevron* deference.  *Encino*, 136 S. Ct. at 2124-25.  Where there is no basis for deference under *Chevron*, the Court must construe an ambiguous statute *de novo* to determine the "best interpretation."  *Chudik v. Hirshfeld*, 987 F.3d 1033, 1039 (Fed. Cir. 2021) (citations omitted).  Here, that requires the Court to find that the CDSOA compels Customs to distribute § 1505(d) interest.

The Court accordingly should grant Plaintiffs' motion for judgment on the administrative record and order Customs to distribute the § 1505(d) interest the agency has wrongfully withheld from them.

## RULE 56.1 STATEMENT

### A.    Administrative Determination Under Review

The administrative determination to be reviewed is Customs' decision to withhold from distribution under the CDSOA all delinquency interest accruing under § 1505(d) that the agency collected on late payments of AD duties that were assessed under the Four Orders and were subject to distribution under that statute. This Court previously held that Customs provided notice of this administrative determination in its September 21, 2001 notice of final rulemaking for its regulations implementing the CDSOA.  *See Adee Honey*, 450 F. Supp. 3d at 1372 (citing NFRM).

B.     **Issues Presented**

1.     Whether the CDSOA's directive that Customs "distribute all funds (including all interest earned on the funds) from assessed duties received in the preceding fiscal year to affected domestic producers" unambiguously requires Customs to distribute collected § 1505(d) interest that accrued on late payments of AD duties that were subject to distribution under the statute.

2.     To the extent the CDSOA is ambiguous concerning the types of interest that Customs must distribute, whether the Court must defer under *Chevron* to Customs' decision to withhold § 1505(d) interest when (1) that decision manifestly frustrated Congress' purpose in enacting the CDSOA; (2) Congress only delegated limited authority to Customs to prescribe regulations for the "time and manner" of CDSOA distributions; and (3) Customs failed to present any contemporaneous reason for its interpretation, and later revealed it made that decision for the agency's own administrative convenience.

### FACTUAL AND PROCEDURAL HISTORY

A.     **The CDSOA Requires Customs to Distribute "All Interest" "Earned" on "All Funds" from Assessed AD/CV Duties Received**

The CDSOA amended the Tariff Act of 1930 (Tariff Act) to direct Customs to distribute all collected AD/CV duties owed on entries liquidated on or after October 1, 2000 to ADPs as compensation for economic injuries caused by the relevant imports. 19 U.S.C. § 1675c(a).  To achieve this, the CDSOA requires Customs to "distribute all funds (including all interest earned on the funds) from assessed duties received" in the preceding fiscal year to affected domestic producers" on a *pro rata* basis, based on new and remaining qualifying expenditures.  19 U.S.C.

§ 1675c(d)(3).[14]  The CDSOA directs the Customs Commissioner to (1) "*prescribe procedures for distribution* of the continued dumping or subsidies offset required by this section" (19 U.S.C. § 1675c(c)); and, (2) "[c]onsistent with the requirements of subsections (c) and (d), . . . by regulation *prescribe the time and manner* in which distribution of the funds in a special account shall be made."  19 U.S.C. § 1675c(e)(3) (emphasis added).

**B.    At the Outset of Its Rulemaking Process, Customs Planned to Include § 1505(d) Interest in CDSOA Distributions, But Later Decided Against This**

Customs convened its first CDSOA "Task Force" meeting on November 16, 2000, shortly after the statute's enactment on October 28, 2000.  *See* AR Supp. 503-07.  That meeting's minutes reports the numerous challenges that confronted the agency in implementing the statute, and observes that "Customs had neither the opportunity to comment on these provisions, nor the ability to request clarification from Congress."  *Id.* at 504.

The minutes of a February 21, 2001 planning meeting expressing the "current position of the agency" shows that Customs initially planned to distribute *both* § 1505(d) delinquency interest and § 1677g interest:

> 10. OF and OIT[15] will consider possible methods for assigning 1505 interest to specific AD/CV cases for purposes of deposit into the Clearing Account and eventual transfer into the Special Account for disbursement.
>
> 11. 1677g interest collected at liquidation should be deposited into the Clearing Account and eventually transferred into the Special Account for disbursement.

AR Supp. 511.

---

[14]   The CDSOA mandates that "[s]uch distribution shall be made not later than 60 days after the first day of a fiscal year from duties assessed during the preceding fiscal year."   19 U.S.C. § 1675c(c).

[15] At that time, "OF" referred to Customs' Office of Finance, and "OIT" referred to Customs' "Office of Information & Technology."

On June 26, 2001, Customs issued its NPRM, which states at the fourth and last sentence of proposed §159.64(e) – titled "Interest on Special Accounts and Clearing Accounts" – that "statutory interest charged on" AD/CV "duties at liquidation" – *i.e.*, § 1677g interest – "will be transferred to the . . . Special Account when collected from the importer."  66 Fed. Reg. at 33,926.  But the NPRM nowhere states that § 1677g interest is the only type of "statutory" interest that will be distributed under the CDSOA, or specifically excludes § 1505(d) interest from distribution.  In fact, the NPRM's preamble states by this sentence that § 1505(d) interest *will* be distributed under the CDSOA: "[I]f there is interest paid by the importer on any antidumping or countervailing duties billed in the liquidation process for the import entries, that interest will be transferred to the . . . Special Account . . . ."  *Id.* at 33,922.  Of course, § 1505(d) interest accrues on all AD/CV "duties billed in the liquidation process for the import entries" that are not paid within 30 days of their bill date.

Nevertheless, an August 19, 2001 Customs memo titled "ADD/CVD Issues" (AR Supp. 576-579) refers to Customs' "[d]ecision" to not distribute "accrued interest for late payment of bill," *i.e.*, § 1505(d) interest:

> NOTE: Decision has been made that accrued interest for late payment of bill will not be made available for disbursement under Byrd Amendment.  Accrued interest will continue to have class code [redacted] and go to General Fund receipts.

AR Supp. 579.  This document, however, does not identify Customs' *reason* for this decision.

On September 21, 2001, Commerce issued its NFRM.  The last sentence of the final regulations' § 159.64(e) is essentially the same as in the provisional regulations.  Customs, however, replaced the sentence in the NPRM's preamble discussed above – "[I]f there is interest paid by the importer on any antidumping or countervailing duties billed in the liquidation process for the import entries, that interest will be transferred to the . . . Special Account . . . ." (66 Fed.

Reg at 33,922) – with this sentence in the NFRM: "Thus, *only* interest charged on antidumping and countervailing duty funds themselves, pursuant to the express authority in 19 U.S.C. 1677g, will be transferred to the special accounts and be made available for distribution under the CDSOA."  66 Fed. Reg. at 48,550 (emphasis added).  While the Court found in its prior ruling that this statement constitutes adequate notice of Customs' *decision* to withhold delinquency interest from CDSOA distribution,[16] nothing in the NFRM identifies Customs' *reason* for withholding § 1501(d) interest.

### C. In Late July 2014, Customs Informed Plaintiffs It Would Withhold from CDSOA Distribution $5.5 million of the $6.1 million *Great American* Award it Applied to Recover Accrued § 1505(d) Interest

Plaintiffs first learned that Customs was not distributing collected § 1505(d) interest under the CDSOA in late July 2014, when the agency acknowledged that it would include in that year's CDSOA distribution only $400,000 of the $6.1 million judgment it had won against the surety of six single entry customs bonds ("SEBs") that secured the payment of that amount in unpaid AD duties assessed under the Crawfish Order ("*Great American*" award).[17]  *See* Am. Compl. ¶ 13-26 (ECF No. 22) (Feb. 6, 2017).

This was the first court judgment the Government won for the payment of AD/CV duties secured by thousands of single entry customs bonds that Customs accepted on entries made under the Four Orders through August 2006.  Because the Government filed that lawsuit just before the running of the applicable six-year statute of limitations, and the final court judgment

---

[16]  *See Adee Honey*, 450 F. Supp. 3d at 1373.

[17]  *United States v. Great Am. Ins. Co*., 791 F. Supp. 2d 1337 (Ct. Int'l Trade 2011), *aff'd in part, rev'd in part*, 738 F.3d 1320 (Fed. Cir. 2013), *rev'd judgment on remand*, CIT Ct. No. 09-00187 (ECF No. 135) (Mar. 13, 2014).

was not issued for another five years, $5.5 million in § 1505(d) interest accrued on the unpaid AD duties over that 11 year period. *Id.* ¶ 19.

Customs told Plaintiffs it was first required to pay the U.S. Department of Justice a statutory litigation fee of 3 percent of the judgment, and to next pay down under 19 C.F.R. § 24.3a the $5.5 million in accrued delinquency interest. *Id.* This left only $400,000 – less than 7 percent – of the award to be applied to the $6.1 million in unpaid AD duties. *Id.* Customs informed Plaintiffs of its view that collected § 1505(d) interest was not subject to CDSOA distribution, and that as a result only the $400,000 in collected AD duties would be included in that year's CDSOA distribution. *Id.*

### D.   Congress Enacted Section 605, Reiterating that "All Interest" in the CDSOA Means "All Interest"

Like Plaintiffs, Congress first learned that Customs had interpreted the CDSOA's "all interest" as being limited to § 1677g interest through the agency's withholding of the $5.5 million (93 percent) of the *Great American* award it applied to recover accrued § 1505(d) interest. Through Section 605 of the Trade Facilitation and Trade Enforcement Act of 2015, Pub. L. 114-125 (Feb. 24, 2016) (Sec. 605), Congress amended the CDSOA to require Customs to include in CDSOA distributions three other types of interest that can accrue on unpaid AD duties in addition to § 1677g interest – § 1505(d) interest; statutory interest under 19 U.S.C. § 580 (§ 580 interest) that accrues on amounts owed Customs that are secured by customs bonds and are subject to court judgment; and court-ordered "equitable" interest – that are collected by application of bond payments received on or after the first day of FY 2015.

Sec. 605's legislative history shows that it was not an expansion of the CDSOA's scope of distributable interest, but was instead enacted to correct Customs' misreading of it, as evidenced by Senator John Thune's comments on the Senate floor:

Duties collected on dumped imports and all interest on those duties . . . were to be paid to the injured domestic producers to allow them to reinvest and rebuild. For reasons that defy simple explanation, CBP *ignored* the direction of the statute to pay all interest to producers and instead deducted some types of interest from payments to producers . . . . This practice defies the plain language of the statute and cost domestic producers tens of millions of dollars over the years.

During the Finance Committee markup of this legislation, Senator Grassley, Senator Nelson, and I offered an amendment which is included in this conference report that *corrects CBP's misreading of the law*. This is an important victory for honey, crawfish, garlic, and mushroom that have suffered from Chinese dumping and CBP's unfounded practice.

Congressional Record, Feb. 11, 2016, at S843 (emphasis added).

E.   **Plaintiffs Filed Suit to Recover All § 1505(d) Interest That Customs Withheld from the FY 2001 through FY 2014 CDSOA Distributions**

Plaintiffs initiated this action on July 15, 2016[18] to recover all § 1505(d) interest that Customs withheld from the FY 2001 through FY 2014 CDSOA distributions, including the $5.5 million it withheld from the *Great American* judgment.[19]   On February 27, 2017, the Government moved to dismiss Plaintiffs' claims as time-barred on the ground that Plaintiffs' claims accrued on September 21, 2001, when the NFRM was issued and supposedly placed Plaintiffs on notice of Customs' decision to withhold § 1505(d)interest from CDSOA distribution. *See* ECF No. 26.

---

[18] Plaintiffs initiated this action as four separate lawsuits, each brought by a group of plaintiffs who were ADPs under one of the Four Orders:
1. *Adee Honey Farms v. United States*, CIT Ct. No. 16-00127 (Honey Order)
2. *Christopher Ranch, LLC v. United States*, CIT Ct. No. 06-00129 (Garlic Order)
3. *Monterey Mushrooms, Inc. v. United States*, CIT Ct. No. 16-00130 (Mushroom Order)
4. *A&S Crawfish v. United States*, CIT Ct. No. 16-00131 (Crawfish Order)

On September 21, 2016, the Court entered an order consolidating these actions under the lead caption set forth above. *See* Order (ECF No. 13).

[19] The Government settled Plaintiffs' claims for delinquency interest from the *Great American* judgment in May 2017. *See* Status Report (ECF No. 31) (Jun. 22, 2017).

The Court granted, in part, and denied, in part, the Government's motion on June 1, 2020. *Adee Honey* at 1367. In its decision, the Court held that the 2001 NFRM placed Plaintiffs on notice of Customs' decision to distribute only 1677g interest. *Id.* at 1373-74. The Court found that, although the regulation itself did not expressly state that other types of interest would not be distributed, the regulation, "when read together with the preamble language that pertained to it, provided adequate notice of the agency's decision that no type of interest other than Section 1677g interest would be deposited into the special accounts for distribution to ADPs." *Id.* at 1373.

Next, the Court held that Plaintiffs' causes of action against the Government accrued both: (1) at the time the regulations were promulgated on September 21, 2001; and (2) each time Customs applied its decision to withhold delinquency interest, which occurred annually at the time of Customs' CDSOA distributions. *Id.* at 1376. On this basis, the Court held that all of Plaintiffs' claims were barred by the two-year statute of limitations except for Plaintiffs' claims for the two years prior to the initiation of Plaintiffs' lawsuit, *i.e.*, FY 2014 and FY 2015. *Id.* at 1377.[20]

**F.    Customs' Administrative Record Discloses No Basis for the Agency's Decision to Withhold Delinquency Interest Other Than Its "Technological Limitations"**

The Government filed its initial Administrative Record (AR) in August 2020. ECF No. 90 (Aug. 6, 2020) (public) and ECF No. 93 (Aug. 14, 2020) (confidential). The AR contained no documents that were before the agency at the time of the NPRM or NFRM, but instead consisted mainly of documents relating to Plaintiffs' individual CDSOA distributions for FY 2014-19. Plaintiffs moved to strike the AR on the grounds that it did not include "the findings or report

---

[20] Plaintiffs preserve for appeal all of their claims as to CDSOA distributions for FYs 2001-13.

upon which such determination was based," *i.e.*, "the full administrative record that was before [Customs] at the time [it] made [its] decision" to withhold delinquency interest, which the Court found was in September 2001.  Motion to Strike at 3 (ECF No. 94) (Sept. 15, 2020) (citing 28 U.S.C. § 2635(d)(1) and USCIT R. 73.3(a); *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971)).

In their motion to strike, Plaintiffs referenced a September 21, 2016 letter from then Commissioner of Customs R. Gil Kerlikowske to two U.S. Senators that states that Customs had decided to exclude § 1505(d) interest from CDSOA distribution because of "gaps in [its] technological capabilities," of which Customs claimed that "Congress seems to have been aware" when it enacted the CDSOA.  Motion to Strike at 7-10, and Ex. 2 (ECF No. 95-2).  Com. Kerlikowske further explained that those same "gaps" still existed, and prevented Customs from including all collected § 1505(d) interest in ongoing CDSOA distributions, despite Sec. 605's clear command that Customs do so.  *Id.* at 2.

The Court, finding that the Commissioner's letter "indicates that Customs possessed documents relevant to congressional intent that could constitute legislative history of the CDSOA," ordered Customs to supplement the AR with all documents and information relevant to the agency's decision to exclude delinquency interest from CDSOA distributions.  *Adee Honey Farms v. United States*, Slip Op. 20-184 at 7, 2020 Ct. Intl. Trade LEXIS 196, at *8 (Dec. 21, 2020) (ECF No. 102).

The Government produced its AR Supp. in response to the Court's decision.  ECF Nos. 105, 106.  Contrary to Com. Kerlikowske's September 21, 2016 letter to Congress, the AR Supp. contains no document that suggests Congress was aware when the CDSOA was enacted that Customs was incapable of including collected § 1505(d) interest in CDSOA distributions.  To the

14

contrary, Customs staff expressed concern shortly after the CDSOA's enactment that Congress

had not consulted with Customs before enacting the CDSOA, so Congress could not have been

aware of the "technological" concern.  AR Supp. at 504.

The only reason provided in the AR Supp. for Customs' decision to withhold § 1505(d)

interest is in the February 19, 2021 declaration of Sean Wuethrich, Chief of Customs' Programs

Execution Section, which is the office charged with implementing the CDSOA.  AR Supp. 005-

008.  Mr. Wuethrich, who was charged with certifying the contents of the AR Supp. under

USCIT Rule 73.3(a), declared:

> Although I was not employed by Customs at the time of the 2001
> Final Rule promulgation, it is my understanding through the
> passing of institutional knowledge that *technological limitations of
> Customs' Automated Commercial System ("ACS")* were a reason
> for the decision to distribute only 19 U.S.C. § 1677g interest.
> Customs' automated system was created before the existence of
> the CDSOA and had limitations, including that it did not – and
> does not – identify 19 U.S.C. § 1505(d) delinquency interest on
> particular line-items in an entry. As a result, Customs' automated
> system did not differentiate the amount of 19 U.S.C. § 1505(d)
> delinquency interest, if any, that was attributable to CDSOA-
> subject lines of an entry. *This is the only reason that I have been
> made aware of for this decision.*

AR Supp. 006 (emphasis added).

## ARGUMENT

The CDSOA requires Customs to distribute to ADPs "*all* funds (including *all interest*

earned on the funds) from assessed duties received in the preceding fiscal year."  19 U.S.C.

§ 1675c(d)(3).  Congress' use of "all interest" shows (1) it was then aware there was *more than*

*one type* of interest that accrues on assessed but unpaid AD/CV duties; and (2) it intended that *all*

such types of interest – including § 1505(d) – to be subject to CDSOA distribution.  Customs

nevertheless decided that "all interest" applies only to § 1677g interest, but failed to give any

contemporaneous reason for that decision.

15

The Court must review Customs' reading of the CDSOA's "all interest" provision as not applying to § 1505(d) interest under the two-step *Chevron* analysis.  As explained below, Customs' reading fails on *Chevron*'s first step because Congress's requirement that Customs distribute "all interest" on funds from assessed duties unambiguously includes all types of interest that can accrue on unpaid AD/CV duties, including § 1505(d) interest.  Even if Congress' intent were not clear, *Chevron* deference to the agency's reading is not available because (1) that reading manifestly frustrates Congress' core purpose in enacting the CDSOA: redirecting all collected AD/CV duties and interest to ADPs injured by the continued dumping and subsidization of imports; (2) Customs failed to provide any contemporaneous *reason* for its reading; and (3) that reading was improperly (and secretly) based on Customs' own administrative convenience.  Each of these faults renders Customs' decision arbitrary and capricious – *i.e.*, unreasonable – as a matter of law.

## I.     STANDARD OF REVIEW

In a residual jurisdiction action brought pursuant to 28 U.S.C. § 1581(i), the Court reviews the matter as provided in the Administrative Procedure Act (APA), under which the Court shall "hold unlawful and set aside agency action, findings, and conclusions found to be— (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; . . . [or] (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right[.]" 5 U.S.C. §§ 706 (A), (C); 28 U.S.C. § 2640(e).

The APA directs the Court to resolve challenges to agency action, like Plaintiffs' here, by "review[ing] the whole record or those parts of it cited by a party."  5 U.S.C. § 706.  The United States Supreme Court has defined the "whole record" within 5 U.S.C. § 706 as "the full administrative record that was before the Secretary *at the time he made his decision*."  *Citizens to Preserve Overton Park, Inc.,* 401 U.S. at 420 (emphasis added).

16

Statutory interpretation is an issue of law, which the Court generally reviews *de novo* and without deference to an administrative agency's interpretation. *Salman Ranch Ltd. v. United States*, 573 F.3d 1362, 1370 (Fed. Cir. 2009) (citing *AD Global Fund, LLC v. United States*, 481 F.3d 1351, 1352-53 (Fed. Cir. 2007)). Where Congress either leaves a gap in the construction of the statute that the administrative agency is explicitly authorized to fill, or implicitly delegates legislative authority to the agency, as evidenced by "the agency's generally conferred authority and other statutory circumstances," the Court reviews the matter pursuant to the two-step inquiry set forth in *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc*., 467 U.S. 837, 842-44 (1984). *United States v. Mead Corp*., 533 U.S. 218, 229 (2001).

The first question under *Chevron – Chevron* step one – is whether Congress has directly spoken to the precise question at issue, which here is whether Congress intended Customs to distribute under the CDSOA "all" types of interest that accrue on unpaid AD/CV duties, including § 1505(d) interest. *Miller v. Office of Personnel Mgmt*., 903 F.3d 1274, 1281-82 (Fed. Cir. 2018) (reversing Merit Systems Protection Board's interpretation of statute governing the computation of civil service annuity as inconsistent with the statute's "plain terms.") (citing *Chevron* at  467 U.S. 843). If the answer is yes, then the inquiry ends, and the Court must give effect to Congress' unambiguous intent. *Id.* If the answer is no, the second question is whether the agency's answer to the precise question at issue is based on a permissible construction of the statute. *Id.* The agency's interpretation governs in the absence of unambiguous statutory language to the contrary or the agency's unreasonable resolution of language that is ambiguous. *Id.* No such deference is due, however, where the agency's interpretation exceeds the authority delegated by Congress. *Gonzales*, 546 U.S. at 258. Nor is deference warranted where the

agency acts by rulemaking, but fails to provide "adequate reasons" for its decision, which renders the decision arbitrary and capricious. *Encino*, 136 S. Ct. at 2125.

## II. *CHEVRON* STEP ONE: THE CDSOA UNAMBIGUOUSLY REQUIRES CUSTOMS TO DISTRIBUTE "ALL INTEREST," INCLUDING DELINQUENCY INTEREST, TO PLAINTIFFS

At *Chevron* step one, the Court must determine whether Congress' intent is clear in the CDSOA. As explained below, the CDSOA unambiguously requires Customs to distribute all types of interest that accrue on unpaid AD/CV duties that are subject to the CDSOA, including 19 U.S.C. § 1505(d) interest. Accordingly, the Court's inquiry should begin and end at *Chevron*'s first step, and, finding that Customs' contrary interpretation of the CDSOA is wrongful, the Court should grant Plaintiffs' motion for judgment on the administrative record.

### A. To Determine Congress' Intent as to § 1505(d) Interest, the Court Must Give the Relevant CDSOA Text Its Plain Meaning and Look to the CDSOA's Purpose

To determine whether Congress has expressed its unambiguous intent in a statute, the Court must "begin with its literal text, giving it its plain meaning." *Hawkins v. United States*, 469 F.3d 993, 1000 (Fed. Cir. 2006) (citing *Timex V.I., Inc. v. United States*, 157 F.3d 879, 882 (Fed. Cir. 1998)); *Supernus Pharms., Inc. v. Iancu*, 913 F.3d 1351, 1358 (Fed. Cir. 2019) ("[T]he 'starting point in every case involving construction of a statute is the language itself.'") (quoting *Kelly v. Robinson*, 479 U.S. 36, 43 (1987)). "Absent a clearly expressed legislative intention to the contrary, [the statute's plain] language must ordinarily be regarded as conclusive." *Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 108 (1980). The court must also look to the purpose of the provision at issue and its placement within the whole statute. *Candle Corp. of Am. v. United States*, 374 F.3d 1087, 1093 (Fed. Cir. 2004) (a court "will not look merely to a particular clause in which general words may be used, but will take in connection with it the whole statute (or statutes on the same subject) and the objects and policy

18

of the law, as indicated by its various provisions, and give it such a construction as will carry into execution the will of the Legislature.") (citation omitted).  Finally, the Court may look to the legislative history to determine whether an intent to contrary to the statute's plain meaning exists.  *Sharp v. United States*, 580 F.3d 1234, 1238 (Fed. Cir. 2009).

Here, as explained below, the CDSOA's plain language, its purpose and placement within the overall statutory scheme, and Congress' Findings made in enacting that law all demonstrate Congress' clear intent that Customs distribute all types of interest that accrues on CDSOA-subject AD/CV duties to ADPs.

**B.**     <u>By Its Plain Meaning, the CDSOA Unambiguously Requires the Distribution of Delinquency Interest</u>

        **1.**     <u>The Text of the Distribution Provision Is Unambiguous</u>

In directing Customs to distribute to ADPs "all funds" from assessed AD/CV duties and "all interest" earned on such funds, Congress made clear that the agency must include any delinquency interest that it collects on late payments of assessed AD/CV duties.  The CDSOA provides in its introductory paragraph (a) that, "in general," duties assessed pursuant to an AD duty order shall be distributed on an annual basis to affected domestic producers.  19 U.S.C. § 1675c(a).[21]

In paragraph (d)(3) (Distribution Provision), Congress specifies the "funds" that must be included in the annual distribution:

(3) <u>Distribution of funds</u> The Commissioner shall distribute *all funds (including all interest earned on the funds) from assessed duties received in the preceding*

---

[21] *(a) In general* Duties assessed pursuant to a countervailing duty order, an antidumping duty order, or a finding under the Antidumping Act of 1921 shall be distributed on an annual basis under this section to the affected domestic producers for qualifying expenditures. Such distribution shall be known as the "continued dumping and subsidy offset."  19 U.S.C. § 1675c(a).

*fiscal year* to affected domestic producers based on the certifications described in
paragraph (2). The distributions shall be made on a pro rata basis based on new
and remaining qualifying expenditures.

19 U.S.C. § 1675c(d)(3) (emphasis added).

Accordingly, by its plain language, the CDSOA's Distribution Provision requires
Customs to distribute "*all funds* . . . from assessed duties," which includes "*all interest* earned on
the funds."   19 U.S.C. § 1675c(d)(3) (emphasis added).   Section 1505(d) interest constitutes
"interest earned on" "funds . . . from assessed duties."

As an initial matter, Customs does not dispute that the phrase "assessed duties" refers to
duties assessed by Customs pursuant to an AD/CV duty order on an entry that is subject to the
CDSOA.  *See* 19 U.S.C. § 1675c(a).  Nor can there be any question that delinquency interest
collected under § 1505(d) – like § 1677g interest and § 580 interest – constitutes "funds."  *Id.*  To
determine the plain meaning of undefined statutory terms, the U.S. Court of Appeals for the
Federal Circuit (Federal Circuit) customarily refers to the common dictionary definition of the
term contemporaneous to the time the statute was enacted.  *N.Y. & Presbyterian Hosp. v. United
States*, 881 F.3d 877, 882 (Fed. Cir. 2018) ("'It is a fundamental canon of statutory construction
that . . . words will be interpreted as taking their ordinary, contemporary, common meaning,'
which may be derived from '[d]ictionaries from the era of [the statutory provision]'s
enactment.'") (quoting *Sandifer v. U.S. Steel Corp.*, 571 U.S. 220, 227 (2014)). The ordinary,
contemporaneous dictionary definition of "funds" is (1) "a sum of money or other resources set
aside for a specific purpose"; and (2) "available money; ready cash."  *See American Heritage
College Dictionary* 551 (3rd Ed. 2000) (defs. 2.a, b.).  Delinquency interest that is collected by
Customs is unquestionably a "sum of money."  *Id.*  The preposition "from" is used in 19 U.S.C.
§ 1675c(d)(3) to indicate the source or reason for something.  *See id.* at 547 (def. 2) ("used to
indicate a source, a cause, an agent, or an instrument.").  Section 1505(d) interest accrues on the

20

outstanding balance of assessed duties, and therefore it comes "*from* assessed duties."  19 U.S.C. § 1675c(d)(3).  Section 1505(d) interest thus constitutes "funds . . . from assessed duties," which Customs is required to distribute.

Further, Congress emphasized the broad scope of the Distribution Provision by requiring that Customs distribute "*all* funds" from assessed duties, and "*all* interest" on such funds.  19 U.S.C. § 1675c(d)(3) (emphasis added).  Congress' use of the qualifier "all" when referring to interest shows that (1) it was then aware that there was *more than one type* of interest accrues on assessed but unpaid AD/CV duties; and (2) it intended that *all* such types of interest – including § 1505(d) interest – to be subject to CDSOA distribution.  Indeed, there are at least three different types of interest that accrue on unpaid AD/CV duties: (1) § 1505(d) interest; (2) interest under 19 U.S.C. § 580 ("§ 580 interest"), which accrues on court awards of late payments under surety bonds that secure AD/CV duties; and (3) § 1677g interest.

This Court has twice held, as urged by Customs, that § 1505(d) interest in fact accrues on unpaid AD/CV duties, and that importers (and their bond sureties) are liable for paying such interest.  *United States v. Am. Home Assur. Co*., 113 F. Supp. 3d 1297, 1312 (Ct. Int'l Trade 2015), *aff'd*, Appeal No. 18-1487 (Fed. Cir. Sept. 6, 2019) (per curiam); *United States v. Am. Home Assur. Co*., 151 F. Supp. 3d 1328, 1362 (Ct. Int'l Trade 2016), *aff'd*, Appeal Nos. 2018-1960, -2120 (Fed. Cir. Sept. 6, 2019) (per curiam).  As noted, the Federal Circuit upheld this finding in both cases *per curiam* – without an opinion.

In addition, "all" has a broad, inclusive common meaning that is not compatible with the restrictive interpretation Customs has assigned to "interest" under the CDSOA.  As the Supreme Court recently held, "[T]he modifier 'all' … conveys breadth."  *Peter v. Nantkwest, Inc*., 140 S. Ct. 365, 372 (2019); *see also Life Techs. Corp. v. Promega Corp*., 137 S. Ct. 734, 740 (2017)

21

("'All' means the entire quantity, without reference to relative importance.'") (quoting Webster's

Third New International Dictonary 54 (defs. 1a. 2a. 3) (1981)).  "'The use of the word 'all' …

cannot be regarded as accidental,'" *Williams v. United States*, 289 U.S. 553, 572 (1933) (quoting

*Holmes v. Jennison*, 14 Pet. 540, 570-71)), and there's no reason to think that Congress meant

here for the word "all" to carry anything but its ordinary meaning.

Indeed, the Federal Circuit has confirmed the broad meaning of "all" as used in § 580,

which provides for the accrual of interest "[u]pon *all bonds*, on which suits are brought for the

*recovery of duties*[.]"  *United States v. Am. Home Assur. Co*., 789 F.3d 1313, 1324-25 (Fed. Cir.

2015) (agreeing with Customs and rejecting the surety's claim that § 580 interest did not accrue

under a customs bond that secured unpaid AD/CV duties) (emphasis supplied by the Court).  The

surety defendant in that case argued that § 580 interest could only apply to bonds securing

"normal," non-AD/CV duties because § 580 pre-dated the AD/CV law.  *Id.* at 1324.  Rejecting

this argument, the Court found that "[t]he language – 'all bonds' on which the government sues

for 'the recovery of duties' – is clear and unqualified."  *Id.* at 1325.  Thus, the statute covers

bonds securing AD/CV duties as well as "normal" duties.  *Id.*

As one would expect, the Supreme Court and the Federal Circuit routinely hold that the

word "all" in fact means all.  *Norfolk & W. Ry. Co. v. Am. Train Dispatchers Ass'n*, 499 U.S.

117, 129 (1991) ("By itself, the phrase 'all other law' indicates no limitation."); *Gardner v. State

of N.J.*, 329 U.S. 565, 573 (1947) ("The words 'all holders of claims' have no qualification and

are sufficiently broad to include public agencies as well as private parties."); *TiVo, Inc., v.

EchoStar Corp*., 646 F.3d 869, 889 (Fed. Cir. 2011) ("Plainly, the word 'all' refers to *all* DVR

functionality, infringing or not…."); *SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys.,

Inc*., 242 F.3d 1337, 1344 (Fed. Cir. 2001) ("The words 'all embodiments of the present

invention' are broad and unequivocal.  It is difficult to imagine how the patents could have been clearer in making the point…."").  Because the statute covers "all interest," and because § 1505(d) is a major type of interest that accrues on unpaid AD/CV duties, such interest is covered by the term "all interest" in the CDSOA's Distribution Provision.

### 2.    The Government's Interpretation of "All Interest" Defies Reason

In its motion to dismiss, the Government advanced two reasons for why the Distribution Provision's "all interest" is limited to § 1677g interest.  Here is the Government's first reason:

> Duties are assessed at liquidation. 19 U.S.C. § 1500. Because delinquency interest, unlike interest pursuant to section 1677g, would not have accrued when duties are assessed (*i.e.*, at liquidation), Customs considered the term "interest" in the CDSOA phrase "all funds (including all interest earned on the funds) from assessed duties" (emphasis added) as referring only to 1677g interest.

Motion to Dismiss ("MTD") at 3-4 (ECF No. 26) (Feb. 27, 2017).  But Congress did not say that the "funds" and "interest" that Customs must distribute under the CDSOA are limited to funds or interest that accrue *at the time* of liquidation, or any other particular time.  The statutory language says interest "from" assessed duties, not interest "at the time duties are assessed."  The Government here reads a timing requirement into the Distribution Provision that does not exist.  To the contrary, the only timing-based restriction in the Distribution Provision is that the funds and interest that Customs must distribute are limited to funds and interest that were "received in the preceding fiscal year."  19 U.S.C. § 1675c(d)(3).  Thus, the Government's interpretation is contrary to the clear wording of the statute.

The Government's second reason, made in a footnote, fares no better.  MTD at 4, n.3.  It is based on a separate provision of the CDSOA, 19 U.S.C. § 1675c(e)(2), which requires Customs to deposit duties and interest into a "special account" before distributing them at the end of the fiscal year pursuant to the Distribution Provision.  That provision provides that:

> The Commissioner shall deposit into the special accounts, all antidumping or countervailing duties (including interest earned on such duties) that are assessed after the effective date of this section under the antidumping order or finding or the countervailing duty order with respect to which the account was established.

19 U.S.C. § 1675c(e)(2) (the "Deposit Provision"). Seizing on the word "under," the Government contends that "[o]nly amounts assessed at liquidation can be considered as assessed 'under' Commerce's AD/CV duty order." MTD at 4, n.3. Again, the Government imposes a limitation where none exists. The clearest construction of that provision is that it refers to interest that is "earned on" *duties* that were assessed under an AD/CV order on or after the CDSOA's effective date (Oct. 1, 2000), and not to interest that is "assessed" under an AD/CV order. 19 U.S.C. § 1675c(e)(2). Interest that is "earned on" AD/CV duties is not limited to interest that accrues at the time of liquidation, and includes § 1505(d) interest.

The Government's narrow reading of the Deposit Provision also fails because it would bring that provision into conflict with the Distribution Provision's broad requirement that Customs distribute "all funds" from assessed duties, including "all interest earned" on those funds, which unambiguously includes delinquency interest. 19 U.S.C. § 1675c(d)(3). The Government would restrict the broad category of funds and interest that Customs is required to distribute under the Distribution Provision to the more limited (under the Government's tortured reading) category of funds and interest that Customs must deposit into the special accounts under the Deposit Provision.

But it is an elementary rule of construction that "[t]he provisions of a text should be interpreted in a way that renders them compatible, not contradictory," and "there can be no justification for needlessly rendering provisions in conflict if they can be interpreted harmoniously." *U.S. Capitol Police v. Office of Compliance*, 908 F.3d 748, 759 (Fed. Cir. 2018) (citation omitted). Further, "'interpretations of a statute which would produce absurd results are

to be avoided if alternative interpretations consistent with the legislative purpose are available.'" *Aqua Prods.. Inc. v. Matal*, 872 F.3d 1290, 1308 (Fed. Cir. 2017) (quoting *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 575 (1982)).  Customs' interpretation of the Deposit Provision – as including only § 1677g interest charged on the cash under-deposit of AD/CV duties at the time the duties are assessed – would put it in stark conflict with the Distribution Provision. Construing that provision as referring to interest that is "earned on" AD/CV duties that have been assessed under an AD/CV order avoids such conflict.  *U.S. Capitol Police*, 908 F.3d at 759.

Customs' interpretation of the Deposit Provision also produces the absurd result seen in Customs' disposition of the *Great American* judgment.  There, Customs collected $6.1 million from the surety of an importer who owed that amount in AD duties that were subject to CDSOA distribution.  After applying the majority of the judgment to pay off the delinquency interest that had accrued on the unpaid AD duties, which it deposited into the Treasury, Customs had only $400,000 left to distribute to ADPs.  This absurd result is only attained through Customs' misinterpretation of the statute.  *Aqua Prods.*, 872 F.3d at 1308.

**C.** **The Context and Placement of the Statutory Language Supports the Distribution of § 1505(d) Interest**

When deciding whether Congress' intent is conveyed by the plain language of a statute, "the Court must read the words 'in their context and with a view to their place in the overall statutory scheme.'"  *Intra-Cellular Therapies, Inc. v. Iancu*, 938 F.3d 1371, 1380 (Fed. Cir. 2019) (quoting *King v. Burwell*, 576 U.S. 473, 475 (2015)).  Here, when viewed in the context of the CDSOA and related statutes concerning interest, Congress' directive that Customs distribute "all interest" on funds from assessed duties must be interpreted as covering all types of interest that accrue on unpaid AD/CV duties, including § 1505(d) interest.

1.   **Congress' Findings in Enacting the CDSOA Support Interpreting "All Interest" as Including § 1505(d) Interest**

In enacting the CDSOA, Congress issued a set of "findings" that strongly supports including § 1505(d) interest in CDSOA distributions, and is contrary to distributing only § 1677g interest.  Congress therein observed:

- The AD/CV laws "have as their purpose the restoration of the conditions of fair trade so that jobs and investment that should be in the United States are not lost through the false market signals,"

- However, "[t]he continued dumping or subsidization of imports after the issuance of" AD/CV "orders can frustrate the remedial purpose of the laws by preventing market prices from returning to fair levels."

- Such continued unfair trading could make domestic producers:

    o  "reluctant to reinvest and rehire" in their U.S. operations;

    o  "unable to maintain pension and health care benefits that conditions of fair trade would permit"; and

    o  "unable to pay down accumulated debt, to obtain working capital, or to otherwise remain viable."[22]

Congress further found that the "United States trade laws should be strengthened to see that the remedial purpose of those laws is achieved," and strived to do this through the CDSOA by henceforth distributing all collected AD/CV duties, and "all interest earned" on such duties to ADPs.[23]  The Federal Circuit routinely refers to these Findings in determining Congress' purpose in enacting the CDSOA.  *See, e.g.*, *Candle Corp.*, 374 F.3d at 1093-94; *Huaiyin Foreign Trade Corp. (30) v. United States*, 322 F.3d 1369, 1380-81 (Fed. Cir. 2003).

---

[22] CONGRESSIONAL FINDINGS OF FACT, Oct. 28, 2000, P.L. 106-387, § 1(a), 114 Stat. 1549 (enacting into law § 1002 of Title X of H.R. 5426 (114 Stat. 1549A-72), as introduced on Oct. 6, 2000).

[23] *Id.*

The CDSOA's command that Customs distribute collected AD/CV duties and "all interest earned" on those duties is consistent with, and directly advances, Congress' expressed goal of compensating ADPs for the loss of use of those funds when there is a delay in payment. Indeed, the Government's interpretation flies in the face of Congress' concern that injury to domestic industries be remedied. As seen in the *Great American* example, the longer the Government delays the collection of duties, the more delinquency interest the Government gets to keep – and the less is available to injured domestic industries.

### 2. Both Types of Interest Have the Same Purpose of Compensating the Government for Its Loss of Timely Use of Funds Owed It

Section 1677g interest and § 1505(d) interest have the same purpose of compensating the Government for its loss of the use of assessed but unpaid AD/CV duties during the time of their delinquency.

Section 1677g interest[24] accrues at a statutory rate on the amount by which the final AD/CV duties Customs assesses on an entry at liquidation exceeds that entry's cash deposit of estimated AD/CV duties posted when the entry was made.  That amount is referred to as the entry's "cash under-deposit."  Because an entry's importer is deemed to owe Customs at the time of entry the entire amount of AD/CV duties eventually assessed at liquidation, § 1677g interest accrues on the entry's cash under-deposit from the date of entry to its date of liquidation, as the Government was owed, but was denied the use of that amount over that period.  Accordingly, at liquidation, Customs will bill the entry's U.S. importer for both: (1) the assessed but unpaid AD/CV duties (*i.e.*, the cash under-deposit); and (2) the assessed § 1677g interest.  19 C.F.R.

---

[24] Section 1677g provides that "[i]nterest shall be payable on overpayments and underpayments of amounts deposited on merchandise" subject to AD/CV orders, at the specified rate.  19 U.S.C. § 1677g.

§ 24.3a.  Thus, each initial bill for unpaid AD/CV duties also includes the corresponding amount of § 1677g interest.

The importer has 30 days to pay Customs the full amount of the billed AD/CV duties and § 1677g interest, and any amounts that remain unpaid after 30 days will be charged delinquency interest under § 1505(d) at the same rate as used for § 1677g interest.[25]  Further, for each new 30 day period, any remaining amounts of unpaid AD/CV duties, § 1677g interest and § 1505(d) interest will be again charged § 1505(d) interest.  Like § 1677g interest, § 1505(d) compensates the Government for the lost time value of money when an importer or bond surety fails to timely pay the AD duties that are assessed at liquidation.  *See United States v. Golden Gate Petroleum Co*., 469 F. Supp. 2d 1338, 1340 (Ct. Int'l Trade 2007) (Section 1505(d) "requires that interest be paid on overdue duties to compensate the Government for the opportunity cost associated with the lost revenue" (describing the statutory provision when it was located in subsection (c)) (citations omitted)).  Section 1505(d) interest starts accruing at the same rate as specified for § 1677g interest on the amount of billed § 1677g interest and AD/CV duties and that remain unpaid 30 days after the bill date.  19 C.F.R. § 24.3a.

Also, Customs is required by its regulations to first apply any payment it receives on these amounts to recover accrued interest, and to apply any part of such payments to recover unpaid AD/CV duties only after all § 1677g interest and § 1505(d) interest has been paid.  19 C.F.R. § 24.3a.  Of course, to the extent that any of the AD/CV duties remain unpaid at the end

---

[25] Section 1505(d) provides: "If duties, fees, and interest determined to be due . . . are not paid in full within the 30-day period specified in subsection (b), any unpaid balance shall be considered delinquent and bear interest by 30 day periods, at a rate determined by the Secretary, from the date of liquidation or reliquidation until the full balance is paid.  No interest shall accrue during the 30-day period in which payment is actually made."

of each 30 day period, new § 1505(d) interest will be billed on that amount that must be recovered before any of the duties.

Given the common purpose of § 1505(d) interest § 1677g interest, there is no reason why Congress would have intended to make only the latter subject to CDSOA distribution.

### D.    The Legislative History Does Not Support Any Other Conclusion

Finally, the legislative history does not support any other interpretation.  To determine Congress' intent, the Court may look to the legislative history of a statute, but "'only to determine whether a clear intent contrary to the plain meaning exists.'"  *Sunoco, Inc. v. United States*, 908 F.3d 710, 717-18 (Fed. Cir. 2018) (quoting *Glaxo Operations UK Ltd. v. Quigg*, 894 F.2d 392, 396 (Fed. Cir. 1990)).  Here, there is nothing in the legislative history of the CDSOA that supports Customs' narrow reading of the statute.  To the contrary, the legislative history on the provision demonstrates that Congress intended for the law to compensate domestic producers for their injuries caused by foreign dumping.  *See* Congressional Record, Vol. 145, No. 8 at S497 (Jan. 19, 1999) (Senator Mike DeWine: "Under our bill, duties and fines would be transferred to injured U.S. companies as compensation for damages caused by dumping or subsidization."); Congressional Record at S10697 (Oct. 18, 2000) (Senator Robert Byrd: "Now, such a mechanism will be in place and U.S. farmers and workers of all trades affected by unfair trade practices will be able, in essence, to recover monetarily rather than simply having the right to file a complaint.").

As discussed above, Congress' stated goal of compensating domestic producers is consistent with interpreting the CDSOA to require distribution of § 1505(d) interest. Customs' interpretation of the statute to exclude such interest is contrary to the law's purpose, and leads to the absurd result seen following the *Great American* judgment, where Customs recovered $6.1 million from the surety of an importer who owed that amount in CDSOA-subject AD duties, but

then retained that bulk of the judgment to pay for accrued delinquency interest on the duties, leaving only $400,000 to distribute to ADPs.   *See Aqua Prods.,* 872 F.3d at 1308 ("'[I]nterpretations of a statute which would produce absurd results are to be avoided if alternative interpretations consistent with the legislative purpose are available.'") (quoting *Griffin v. Oceanic Contractors, Inc*., 458 U.S. 564, 575 (1982)).

*     *     *

For the foregoing reasons, the plain language of the CDSOA – consistent with Congress' overall purpose in enacting the statute and its place in the overall statutory scheme – unambiguously requires Customs to distribute "all interest" that is earned on AD/CV duties that are subject to the statute, including § 1505(d) delinquency interest.  Accordingly, the Court must give effect to Congress' unambiguous intent, and there is no occasion for the Court to conduct a *Chevron* step two inquiry into whether Customs' interpretation of the CDSOA to the contrary is entitled to deference.  *Miller*, 903 F.3d at 1281.  On this basis, the Court must find Customs' failure to distribute delinquency interest to Plaintiffs to be unlawful and order the agency to remedy the injury caused to Plaintiffs.

III.   *CHEVRON* **STEP TWO: IF THE COURT FINDS CONGRESS' "ALL INTEREST" IS AMBIGUOUS, NO DEFERENCE IS OWED CUSTOMS' DECISION TO WITHHOLD § 1505(d) INTEREST**

For the reasons discussed above, the Court's inquiry should end at step one of the *Chevron* analysis.  Should the Court find that Congress's intent was in some way unclear, it would proceed to *Chevron* step two, where it would decide whether to defer to the agency's interpretation or construe the statute *de novo*.  *Chevron*, 467 U.S. at 842-44.  As is demonstrated below, no deference is owed Customs' decision to withhold § 1505(d) interest.

30

A.      **Customs' Withholding of § 1505(d) Interest Obviously Frustrated Congress' Purpose in Enacting the CDSOA**

In interpreting a statute's ambiguous text, the Court "'must look beyond the bare text . . . to the context in which the statute was enacted and the purposes it was designed to accomplish.'" *Candle Corp.*, 374 F.3d at 1093-94, *citing Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369, 377 (2004). As noted above in Section II.C.1, the Findings made by Congress show that, in enacting the CDSOA, it intended to increase the remedial benefits to ADPs of the AD/CV laws by having Customs distribute to them all collected AD/CV duties, and all collected interest that accrued on such duties. Customs' withholding of collected § 1505(d) interest obviously frustrated Congress' purpose by ensuring that ADPs would not collect a single dollar of any payment made on delinquent AD/CV duties until all accrued delinquency interest on such duties had been recovered and withheld by Customs from CDSOA distribution. This fundamental fact should guide the Court in determining the amount of discretion that is owed to Customs in making this decision.

B.      **As Customs' Decision to Withhold § 1505(d) Interest is Patently Unreasonable, It Is Owed No *Chevron* Deference**

When a statutory term is sufficiently ambiguous or general to not resolve its meaning, "an agency interpretation must still be a reasonable choice within the range permitted by the statutory words." *Nucor Corp. v. United States*, 927 F.3d 1243, 1248 (Fed. Cir. 2019) (citations omitted); *see also MCI Telecomms. Corp. v. AT&T Co.*, 512 U.S. 218, 229 (1994) ("[A]n agency's interpretation of a statute is not entitled to deference when it goes beyond the meaning that the statute can bear…."). Further, an agency's interpretation of a statute that "'leads to consequences Congress could not have intended'"; is "anomalous" or "incongruous" with the statute's purpose; "stretches" the statute "to the breaking point"; or is not "faithful" to the statute's "text", "is owed no deference under . . . *Chevron*." *Mellouli v. Lynch*, 575 U.S. 789

809-11 (2015) (quoting *Moncrieffe v. Holder*, 133 S. Ct. 1678, 1690 (2013)).  Here, for the reasons discussed in Section II.B.2, the CDSOA is not susceptible to the interpretation that the Government is advancing in this litigation and leads to the absurd result seen in Customs' disposition of the *Great American* judgment, which Congress could not have intended. Accordingly, it is not a "reasonable" interpretation that can be accorded deference under *Chevron*.  *Nucor*, 927 F.3d at 1248.

Beyond Customs' lack of a reasonable interpretation, however, there are several additional reasons, set forth below, why Customs' decision in this case could not be further from the type of agency action that is accorded *Chevron* deference.

### C.  Congress in the CDSOA Did Not Delegate Authority to Customs to Decide What Types of Interest to Distribute

#### 1.  Congress Only Authorized Customs to Promulgate Regulations Concerning the "Time and Manner" of CDSOA Distributions

*Chevron* deference to an agency's interpretation of a statute is not accorded "merely because the statute is ambiguous and an administrative official is involved."  *Gonzales*, 546 U.S. at 258 (citing *United States v. Mead Corp*., 533 U.S. 218, 226-27 (2001)).  Rather, "the rule must be promulgated pursuant to authority Congress has delegated to the official" for the agency interpretation to control.  *Id.*  Where the agency exceeds the limits of that authority, no *Chevron* deference is warranted.  *Id.* at 259.  Here, no deference is warranted to Customs' decision to withhold delinquency interest because Congress in the CDSOA did not delegate authority to Customs to make substantive determinations as to what types of interest to distribute to ADPs and which types to keep.  Instead, Congress only authorized Customs to prescribe regulations governing the "time and manner" of CDSOA distributions.

As the Supreme Court found in *Gonzales*, the degree of an agency's delegated authority depends on the language of the delegation provision itself.  *Id.*  In some cases, that authority is

extensive, as where "the statute gives an agency broad power to enforce all provisions the statute." *Id.* at 258-59 (citing *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 980 (2005)).  In other cases, such as in *Gonzales*, Congress delegates more "limited powers," that must be "exercised in specific ways."  *Id.* at 259.  There, Congress authorized the Attorney General to "promulgate rules and regulations and to charge reasonable fees relating to the *registration and control*" of controlled substances subject to the Controlled Substances Act (CSA).  *Id.* (quoting 21 U.S.C. § 821) (emphasis added).  Under the guise of that authority, the Attorney General issued an Interpretive Rule that announced his intent to restrict the use of controlled substances for physician-assisted suicide as violating the CSA's requirement that medical prescriptions of controlled substances be issued for a "legitimate medical purpose."  *Id.* at 253-54.

After finding that the term "legitimate medical purpose" was ambiguous, the Court held that the Attorney General's interpretation was not entitled to any deference because Congress had restricted his authority to making rules concerning the "registration and control" of controlled substances.  *Id.*  Deciding whether physician-assisted suicide was a "legitimate medical purpose" did not fall within "registration" or "control" of controlled substances as those terms were used in the CSA.  *Id.*  Because the Court found that the Attorney General's decision was outside this limited delegation of authority, it was not entitled to *Chevron* deference.  *Id.*

Here, as in *Gonzales*, Congress delegated to Customs only a limited rulemaking power, that was to be exercised in a specific way.  Specifically, the CDSOA requires the agency to:

> *prescribe procedures for distribution* of the continued dumping or subsidies offset required by this section;
>
> . . .
>
> [and]

33

> *by regulation prescribe the time and manner* in which distribution
> of the funds in a special account shall be made.

19 U.S.C. § 1675c(c), (e)(3) (emphasis added).

Customs' substantive determination that it would only distribute § 1677g interest and withhold § 1505(d) interest from CDSOA distribution goes well beyond Congress' limited delegation of authority to devise "procedures for distribution" of CDSOA funds and regulations governing the "time and manner" of such distributions. *Id.* Because Congress did not authorize Customs to make such determinations, no deference is due to that decision here. *Gonzales*, 546 U.S. at 259; *see also Aqua Prods.*, 872 F.3d at 1320, 1323 (Statute authorizing PTO to set forth "standards and procedures for allowing the patent owner to move to amend the patent" was a limited delegation of rulemaking authority that "does not grant the PTO the power to make *substantive* modifications to the statutory scheme."). *Id.* at 1323 (emphasis added).

### 2.   Congress Only Authorized Customs to Act "By Regulation," Which Does Not Include Decisions Articulated Only in a Preamble

Further, Congress in the CDSOA restricted Customs to exercising its authority "by regulation." 19 U.S.C. § 1675c(e)(3) ("the Commissioner shall *by regulation* prescribe the time and manner in which distribution of the funds in a special account shall be made.") (emphasis added). As the Federal Circuit recently held, "where a statute delegates to the Director the authority to *prescribe regulations* adopting standards, only notice and comment rulemaking by regulation will be given *Chevron* deference." *Aqua Prods.*, 872 F.3d at 1332 (*en banc*) (Moore, J., concurring) (stating the holding of a majority of the justices) (emphasis in original). Because the standards the PTO sought to enforce in that case were not contained within its regulations, the Court accorded no *Chevron* deference. *Id.* at 1332.

Here, Customs did not articulate its decision that it would distribute only § 1677g interest in its regulations, but rather in the preamble to the NFRM. *Adee Honey*, 450 F. Supp. 3d at

1373.  The preamble to the NFRM is not a part of the regulation.  *See N.H. Hosp. Ass'n v. Azar*, 887 F.3d 62, 70 (1st Cir. 2018) ("Although the 2008 regulation was subject to notice and comment, the preamble, like the FAQs announcement, was not") (citing *Leslie Salt Co. v. United States*, 55 F.3d 1388, 1393 (9th Cir. 1995) ("It is undisputed that the preamble has not been subjected to notice and comment.").  Accordingly, no *Chevron* deference can be due to Customs' decision for the independent reason that Customs did not make its decision to withhold delinquency interest "by regulation."  *Aqua Prods.*, 872 F.3d at 1332

### 3.  Congress Delegated No Other Authority to Customs to Make Substantive Interpretations of the CDSOA

Nor did Congress delegate any authority to Customs independent of the CDSOA that would allow Customs to make substantive interpretations of its statutory language.  To the contrary, Congress expressly removed all of Customs' substantive responsibility for administering the AD/CV laws in 1979 and transferred that authority to the U.S. Department of Commerce.  Reorganization Plan No. 3 of 1979, 44 Fed. Reg. 68,273 (1979) (effective as of January 2, 1980 under Exec. Order No. 12,188 of January 2, 1980, 45 Fed. Reg. 989, 993 (1980)) (Reorganization Plan).  Under the Reorganization Plan, Congress transferred from Customs to Commerce "all functions" of title VII of the Tariff Act  – *i.e.*, the AD/CV law, which now includes the CDSOA – except for the ministerial requirements that Customs:

> shall accept such deposits, bonds, or other security as deemed appropriate by the [Commerce] Secretary, shall assess and collect such duties as may be directed by the Secretary, and shall furnish such of its important records or copies thereof as may be requested.

*Id.*  This Court has recognized that:

> [T]he broad transfer of functions from the Treasury Department to Commerce by means of the Reorganization Plan evinces an intent that *Commerce*, not the Treasury Department or Customs, would exercise *substantive responsibility* as administering authority for the antidumping duty laws. *Customs, exercising only a ministerial*

> *role, does not possess the general authority, or the necessary*
> *expertise, to make substantive determinations under those laws.*

*National Fisheries Institute, Inc. v. United States*, 637 F. Supp. 2d 1270, 1293-94 (Ct. Int'l Trade 2009) (Stanceu, J.) (emphasis added).

Congress' limited grant of "time and manner" rulemaking authority to Customs in the CDSOA is fully consistent with the ministerial role that Congress assigned to the agency under the Reorganization Plan. Congress did not, through the CDSOA, expand Customs' otherwise limited, ministerial role, or authorize Customs to make substantive determinations as to what types of interest the statute requires Customs to distribute to ADPs.

### D. As Customs Failed in 2001 to Provide Any Reason for Its Decision to Withhold § 1505(d) Interest, that Decision Is Arbitrary and Capricious

Even if Congress had authorized Customs to interpret undefined terms in the CDSOA, Customs failed in its NFRM to provide any reason for its decision to withhold § 1505(d) interest, so the decision would deserve no deference. Under *Chevron* step two, a court asks "whether an agency interpretation is 'arbitrary or capricious in substance.'" *Judulang v. Holder*, 565 U.S. 42, 53 n.7 (2011) (quoting *Mayo Found. for Medical Ed. and Research v. United States*, 562 U.S. 44, 53 (2011)). Here, Customs' failure to provide any explanation for its decision to withhold delinquency interest in its NPRM or NFRM at the time the decision was made renders that decision arbitrary and capricious. *Encino*, 136 S. Ct. at 2125. Further, the administrative record reveals no internal Customs statutory analysis; to the contrary, it indicates that Customs decided to withhold § 1505(d) interest not because of a reasoned analysis of the statute but for the arbitrary and capricious reason that its own "technological limitations" made distribution of such interest difficult. AR Supp. 006.

It is a basic requirement of administrative rulemaking that "an agency must give adequate reasons for its decisions." *Encino*, 136 S. Ct. at 2125. The agency must "'examine the relevant

data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made.'" *Id.* (quoting *Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Automobile Ins. Co*., 463 U.S. 29, 43 (1983)). That requirement is satisfied "when the agency's explanation is clear enough that its 'path may reasonably be discerned.'" *Id.* (quoting *Bowman Transp., Inc. v. Arkansas-Best Freight System, Inc*., 419 U.S. 281, 286 (1974)). An agency's decision is arbitrary and capricious where it has failed to provide "even that minimal level of analysis," and so the decision "cannot carry the force of law." *Id.* (citations omitted). Further, deference is unwarranted "'when a court concludes that an interpretation does not reflect an agency's authoritative, *expertise-based*, 'fair[, or] considered judgment.'" *Facebook v. Windy City Innovations, LLC*, 973 F.3d 1321, 1352 (Fed. Cir. 2020) (alteration in original and emphasis supplied by the Court) (quoting *Auer v. Robbins*, 519 U.S. 452, 462 (1997)); *Aqua Prods*., 872 F.3d at 1319 ("To be entitled to *Chevron* deference, 'an agency must cogently explain why it has exercised its discretion in a given manner.'") (quoting *State Farm*, 463 U.S. at 48).

In *Encino*, petitioners challenged Department of Labor regulations that reversed the agency's previous statutory interpretation of a Fair Labor Standard Act overtime requirement. *Id.* at 2122-24. Analyzing the agency's decision under the *Chevron* framework, the Supreme Court concluded on step one that the statute was ambiguous, but declined to accord any deference to the agency's interpretation on step two because the agency "offered barely any explanation" for its decision in promulgating the regulation. *Id.* at 2126. With respect to the decision at issue, the agency had simply stated in its final rule notice that it believed its new statutory interpretation "sets forth the appropriate approach, and that "this interpretation is reasonable." *Id*. at 2127. Given this "lack of reasoned explanation," the Court held that "it

follows that this regulation does not receive *Chevron* deference in the interpretation of the relevant statute." *Id.*

Here, Customs provided even less explanation for its decision than did the Department of Labor in *Encino*. *Id*. at 2127. The NPRM and NFRM, are devoid of any reasons for Customs' decision to distribute only § 1677g interest and to withhold § 1505(d) interest. Although this Court found that the NFRM placed Plaintiffs on notice that such a decision had been made, *Adee Honey*, 450 F. Supp. 3d at 1373, there is nothing in the NPRM or NFRM that explains why Customs would differentiate between § 1677g interest and § 1505(d) interest, or why that decision was required or permitted by the statute.

This failure by the agency to explain its reasoning is inexplicable given that the administrative record discloses that Customs was aware of the issue, initially assumed that the statute required distribution of § 1505(d) interest, and attempted to find ways to do so. AR Supp. 511. Although the record reflects that Customs later made a decision to not distribute delinquency interest, AR Supp. 579, there is no contemporaneous explanation or internal analysis supporting this decision anywhere in the record. To the contrary, the record contains a statement by Customs' current Programs Execution Section chief that the "only reason" for the decision was because of "technological limitations of Customs' Automated Commercial System." AR Supp. 006. This admission is extraordinary in that it confirms that Customs' decision was not based on any statutory interpretation – because Customs originally understood the CDSOA to require distribution of delinquency interest (AR Supp. 511) – but rather for the sake of administrative convenience.

Customs' legal justification is the very definition of pretext. Pretextual agency action is arbitrary and capricious. *See Pub. Citizen v. Heckler*, 653 F. Supp. 1229, 1237 (D.D.C. 1986)

("For an agency to say one thing - that all raw milk is a known public health risk, and do another - refuse to ban all types of raw milk, is the essence of arbitrary action.  It indicates that the Secretary's stated reason may very well be pretextual.").  Arbitrary and capricious agency action is due no deference.  *Encino*, 136 S. Ct. at 2125.  Here, Customs acknowledged the statutory obligation to distribute "all" interest, but the agency arbitrarily refused to distribute it all because of administrative convenience.

Because Customs' failure to explain its decision renders it arbitrary and capricious on its face, and because the administrative record only confirms the arbitrary and capricious nature of Customs' decision, there is no basis for *Chevron* deference to Customs' interpretation here.  *Id.*

## IV. **BECAUSE CUSTOMS' INTERPRETATION IS NOT ENTITLED TO DEFERENCE, THE COURT MUST FIND, ON *DE NOVO* REVIEW, THAT CONGRESS INTENDED CUSTOMS TO DISTRIBUTE DELINQUENCY INTEREST**

Where there is no basis for deference under *Chevron*, the Court must construe the statute *de novo* to determine the "best interpretation."  *Chudik*, 987 F.3d at 1039 (citations omitted); *see Aqua Prods.*, 872 F.3d at 1324 ("With nothing to which we must defer for our interpretation of § 316(d) and § 316(e), we are left to determine the most reasonable reading of those provisions.").  In construing the statute *de novo*, the Court may give "the agency's position such weight as warranted under *Skidmore*."  *Chudik*, 987 F.3d at 1039 (citing *Skidmore v. Swift & Co.*, 323 U.S. 134, 139-40 (1944)).

Under *Skidmore*, "'[t]he weight [accorded to an administrative] judgment in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control.'"  *Facebook*, 973 F.3d at 1354 (quoting *Mead*, 533 U.S. at 228) (alteration in original).

Here, for all of the reasons discussed above, Customs' interpretation of the CDSOA is not entitled to any deference under *Skidmore*. Customs' lack of any explanation for its decision in the NFRM means there can be no "thoroughness evident" in Customs' consideration of the issue, or any "validity" to its reasoning on which to defer. *Facebook*, 973 F.3d at 1354. To the contrary, the record shows that Customs' true reason for withholding § 1505(d) interest was for administrative convenience, and not the result of any thorough consideration or valid reasoning. Further, Congress long ago stripped Customs of any substantive responsibility for administering the AD/CV laws, and the agency "does not possess the general authority, or the necessary expertise, to make substantive determinations under those laws." *National Fisheries*, 637 F. Supp. 2d at 1293-94.

Accordingly, for all of the reasons set forth in the *Chevron* step one portion of Plaintiffs' brief, the Court should find that the "best interpretation" and the "most reasonable" interpretation of the CDSOA is that it requires Customs to distribute all delinquency interest that it collects on CDSOA-subject AD duties to ADPs including Plaintiffs. *Chudik*, 987 F.3d at 1039; *Aqua Prods.*, 872 F.3d at 1324.

## CONCLUSION

For the foregoing reasons, the Court should grant Plaintiffs' motion for judgment on the administrative record and order Customs to distribute the delinquency interest the agency has wrongfully withheld from them.

Respectfully submitted,


/s/  Paul C. Rosenthal
PAUL C. ROSENTHAL
MICHAEL J. COURSEY
JOHN M. HERRMANN II
JENNIFER E. MCCADNEY
CAMERON R. ARGETSINGER
KELLEY DRYE & WARREN, LLP
3050 K Street, N.W., Suite 400
Washington, D.C.  20007
(202) 342-8400

*Counsel to Plaintiffs with the exception of Monterey Mushrooms, Inc.*

LOUIS S. MASTRIANI
ADDUCI, MASTRIANI & SCHAUMBERG, L.L.P.
1133 Connecticut Ave., N.W.
Washington, DC 20036
(202) 467-6300

*Co-Counsel to Plaintiffs in A&S Crawfish v. United States, CIT No. 16-00131*


Dated: May 24, 2021

41

**CERTIFICATE OF COMPLIANCE
WITH COURT OF INTERNATIONAL TRADE
STANDARD CHAMBERS PROCEDURES**


      Pursuant to the Court of International Trade Standard Chambers procedures, undersigned counsel for Plaintiffs with the exception of Monterey Mushrooms, Inc. certify that this brief contains 12,911 words, including footnotes.  The word-count certification is made in reliance on the word-count feature contained in Microsoft Word Office 2013.


      Respectfully submitted,


      /s/  Paul C. Rosenthal
      PAUL C. ROSENTHAL
      MICHAEL J. COURSEY
      JOHN M. HERRMANN II
      JENNIFER E. MCCADNEY
      CAMERON R. ARGETSINGER
      KELLEY DRYE & WARREN, LLP
      3050 K Street, N.W., Suite 400
      Washington, D.C.  20007
      (202) 342-8400

      *Counsel to Plaintiffs with the exception of Monterey Mushrooms, Inc.*